******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## IN RE JACQUELINE K.*
## (AC 47584)

Cradle, Clark and Sheldon, Js.

*Syllabus*

The respondent father appealed from the judgment of the trial court terminating his parental rights with respect to his minor child. The father claimed, inter alia, that the court improperly determined that he had failed to achieve the requisite degree of personal rehabilitation required by the applicable statute (§ 17a-112 (j) (3) (B)). *Held*:

The trial court properly concluded that the Department of Children and Families made reasonable efforts pursuant to § 17a-112 (j) (1) to reunify the respondent father with the child, as that determination was not clearly erroneous and was supported by sufficient evidence.

The trial court's determination that the respondent father failed to achieve the requisite degree of personal rehabilitation required by § 17a-112 (j) (3) (B) was not clearly erroneous and was supported by sufficient evidence.

The trial court's finding that termination of the respondent father's parental rights was in the child's best interest was not clearly erroneous.

Argued October 8—officially released December 18, 2024**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New Britain, Juvenile Matters, and tried to the court, *Taylor, J.*; judgment terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed*.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** December 18, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*James P. Sexton*, assigned counsel, with whom were *Emily Graner Sexton*, assigned counsel, and, on the brief, *Gail Oakley Pratt*, assigned counsel, for the appellant (respondent father).

*Nisa Khan*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

CRADLE, J. The respondent father, Matthew S., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his daughter, Jacqueline K.[1] On appeal, the respondent claims that the court improperly concluded that (1) the Department of Children and Families (department) made reasonable efforts to reunify him with Jacqueline pursuant to General Statutes § 17a-112 (j) (1); (2) he failed to achieve the requisite degree of personal rehabilitation required by § 17a-112 (j) (3) (B); and (3) termination of his parental rights was in Jacqueline's best interest.[2] We affirm the judgment of the trial court.

The following facts, as set forth by the trial court, and procedural history are relevant to our resolution of the respondent's claims on appeal. When Jacqueline was born in August, 2021, she tested positive for cocaine and fentanyl and consequently spent several weeks in the neonatal intensive care unit. At the time of Jacqueline's birth, the respondent was incarcerated, in lieu of bond, on charges stemming from his assault of Jacqueline's mother on July 3, 2021, while she was pregnant

---

[1] The termination of the parental rights of Jacqueline's mother has not been challenged on appeal. Accordingly, all references to the respondent are to the respondent father only.

[2] The attorney for the minor child has filed a statement adopting the appellate brief of the petitioner.

with Jacqueline.[3] On August 30, 2021, the petitioner obtained an order of temporary custody of Jacqueline.

On September 3, 2021, both parents appeared before the court and agreed to the sustaining of the orders of temporary custody. On that date, the court issued specific steps for both parents and summarized those specific steps on the record. The court ordered that the respondent comply with several specific steps, including steps that required him to keep all appointments with the department; to take part in treatment recommended by the department; to submit to substance abuse evaluations and follow the recommendations about treatment, including aftercare and relapse prevention; to submit to random drug testing; not to use

---

[3] The court found, and the record reflects, that, "[o]n July 4, 2021, [the department] received a careline report from [Bristol Police] Officer [Taylor] Sutton. Officer Sutton responded to the home after [Jacqueline's mother] had contacted the police informing them that an incident took place on July 3, 2021. [Jacqueline's mother] reported [that the respondent] came over and forced his way inside the home. [Jacqueline's mother] alleged [that the respondent] had hit her head until she was unconscious. Officer Sutton had observed that [Jacqueline's mother] had extensive bruises around her eye, a lump on her head, and a swollen lip. Officer Sutton reported that, during the event, [her son] came out of his bedroom and witnessed some of the incident. [Jacqueline's mother] informed Officer Sutton that she told [her son] to go back to his room and he did. Officer Sutton reported that [Jacqueline's mother] was knocked unconscious and woke up an hour later and saw [the respondent] pacing back and forth so she went back to sleep to avoid a confrontation with [the respondent]. [Jacqueline's mother] then woke back up about 3 a.m. and did not know if [the respondent] was still around. [Jacqueline's mother] got [her son] and left the home to go and get help. Officer Sutton reported there was also a protective order in place at this time. Officer Sutton reported [that the respondent] was arrested and charged with the following: assault in the third degree on a pregnant person, breach of the peace in the second degree, violation of a protective order and use of a motor vehicle without permission. Officer . . . Sutton reported [that] there was a history of domestic violence between [Jacqueline's mother] and [the respondent]. Officer Sutton reported that [the respondent] was admitted to Bristol Hospital on July 4, 2021, because he had passed out behind the wheel of a car." The court noted that there had been three additional instances of intimate partner violence reported between the respondent and Jacqueline's mother prior to the July 3, 2021 incident.

illegal drugs; to attend and complete an appropriate domestic violence program; to secure and maintain adequate housing and a legal income; to comply with protective orders; not to get involved with the criminal justice system; and to visit with Jacqueline as often as the department permitted. In addition to those steps, the court identified the following goals for the respondent: to create and maintain a safe, stable and nurturing environment free from substance abuse and mental health issues; to learn and demonstrate age appropriate parenting, supervision, discipline and developmental expectations of a child with special needs; to understand the impact of unaddressed substance abuse issues on children and to learn and utilize coping skills to refrain from the use of substances; to understand the impact of unaddressed mental health and intimate parenting violence issues on children and to learn and utilize coping skills to maintain stability in the home; and to maintain a nurturing relationship with Jacqueline.

On January 5, 2022, Jacqueline was adjudicated neglected and committed to the petitioner's custody. On that same date, the court issued final steps for both parents. Those specific steps were essentially the same as the specific steps issued by the court on September 3, 2021.[4]

---

[4] The court ordered that the respondent comply with several of the same specific steps ordered on September 3, 2021, including to cooperate with the service providers recommended for parenting and individual counseling, substance abuse assessment and treatment and intimate partner violence services, such as inpatient treatment at Stonington Institute and additional treatment as recommended, individual counseling and medication management at Wheeler Clinic or the equivalent and a parenting education program at Klingberg Family Centers or the equivalent. In addition to those standard specific steps, the court ordered, inter alia, that the respondent make progress toward the following treatment goals: "[l]earn triggers for substance abuse and alternative coping mechanism[s]"; "[u]nderstand [the] impact of substance abuse on children"; "[u]nderstand [the] danger that intimate partner violence presents to children"; "[c]reate and maintain a safe and nurturing home environment free from substance abuse/mental health/intimate

On September 7, 2022, the petitioner filed a petition to terminate the respondent's parental rights on the grounds that Jacqueline previously had been adjudicated neglected and that the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that in a reasonable time, considering her age and needs, he could assume a responsible position in her life.[5] A trial on the termination petition was held on February 27 and November 2, 2023, before the court, *Taylor, J.* The petitioner presented the testimony of Bristol Police Officer Spencer Boisvert and department social worker Susana Lopez-Kossbiel.[6] The respondent testified and presented the testimony of department social worker Jarrod Gormick.

On February 22, 2024, the court issued a memorandum of decision in which it terminated the respondent's parental rights. The court found by clear and convincing evidence that the department had made reasonable efforts to reunify Jacqueline with the respondent and that the respondent was unable or unwilling to benefit from those reunification efforts. The court found that the department had referred the respondent to various programs and services but he was unable or unwilling to benefit from those referrals, as more fully set forth subsequently in this opinion.

The court also concluded that the respondent had failed to achieve an appropriate degree of personal rehabilitation as would encourage the belief that, within a

partner violence"; "[a]ttend all educational/medical/mental health provider meetings for [Jacqueline]"; "[d]evelop stronger parenting skills in the area of [Jacqueline's] mental health and educational needs and behavioral needs."

[5] The petitioner also alleged in the petition that there was no ongoing parent-child relationship between Jacqueline and the respondent. The petitioner withdrew that allegation at trial.

[6] Because the trial also included the petitions to terminate the parental rights of Jacqueline's mother with respect to Jacqueline and Jacqueline's half brother, the petitioner presented the testimony of another witness that did not pertain to the respondent.

reasonable time, considering Jacqueline's age and needs, he could assume a responsible position in her life. In support of this conclusion, the court set forth the following facts. The respondent presented with issues relating to mental health, substance abuse, parenting deficits, domestic violence, criminal recidivism and a failure to complete and benefit from counseling and services. On November 10, 2021, the respondent was admitted to Stonington Institute for inpatient substance abuse treatment. Upon his admission to the program, the respondent tested positive for methamphetamine, cocaine and benzodiazepine. He was successfully discharged from that program in December, 2021, and was referred to Wheeler Clinic for aftercare. He failed to follow up with Wheeler Clinic.[7] When he was discharged from Stonington Institute, the respondent did not make himself easily available to the department, which made it difficult to arrange in-person visitation with Jacqueline. On February 2, 2022, the respondent was readmitted to Stonington Institute for substance abuse treatment. He was unsuccessfully discharged on March 4, 2022, when he left the program against medical advice. He was again referred to Wheeler Clinic for aftercare treatment and again failed to follow up with that referral. The department referred the respondent to a Fatherhood Engagement Program, from which he was unsuccessfully discharged after attending only one session. The department held administrative case reviews on October 20, 2021, and April 13, 2022. The respondent did not attend either of those meetings. At the time of the termination trial, which began on February 27, 2023, the respondent was incarcerated, serving a three year sentence for burglary in the third degree, violation of a protective order and operating a motor vehicle while

---

[7] The respondent testified at trial that he was unable to do so because he was under house arrest at that time.

under the influence of intoxicating liquor or drugs.[8] In 2023, while he was incarcerated,[9] the respondent completed a program offered by the Victim Offender Institutional Correctional Educational Services, which is designed to "broaden inmates' understanding and sensitivity to the impact of their crime on others." The respondent also completed a domestic violence program during his period of incarceration.

The court found that the respondent had failed to comply fully with the specific steps requiring him to maintain consistent contact with the department; to take part in parenting, individual and family counseling and make progress toward the identified treatment goals; to follow recommendations as to substance abuse treatment, including inpatient treatment, aftercare and relapse prevention; not to use illegal drugs or abuse alcohol; to get and maintain adequate housing and a legal income; to comply with protective orders to avoid domestic violence incidents; not to break the law and to comply with any criminal court orders and follow the conditions of probation; to visit the child as often as permitted by the department; and to cooperate with the service providers recommended for parenting, individual and family counseling, substance abuse assessment and treatment, and intimate partner violence services.

The court concluded that the respondent "has been unable to correct the factors that led to [Jacqueline's]

[8] In its memorandum of decision, the court incorrectly found that these offenses had been committed during the time period within which the respondent was subject to the specific step that he not get involved with the criminal justice system. The court's decision reflects, however, that it knew the correct date that the respondent committed these offenses. Additionally, we note that the record does reflect that the respondent was incarcerated on April 1, 2022, on a failure to appear charge, which was within the time period the respondent was subject to the specific steps.

[9] The respondent was sentenced on the charges for which he is currently incarcerated on January 9, 2023.

initial commitment . . . ." The court reasoned: "The clear and convincing evidence reveals that from the date of commitment through the date of the filing of the [termination] petition, and continuing through the time of trial, [the respondent] has not been available to take part in his child's life in a safe, nurturing, and positive manner and based on his issues of mental health, substance abuse, criminal recidivism, parenting deficits, and a failure to complete and benefit from counseling and services, [the respondent] will never be consistently available to Jacqueline.

"The credible evidence in this case clearly and convincingly shows that [the respondent] has consistently failed to be available for [Jacqueline] by virtue of his failure to address his issues appropriately and in a timely manner.

"Unfortunately, the clear and convincing evidence also shows that [the respondent] has failed to improve his parenting ability to acceptable standards as far as [Jacqueline's] safety and emotional needs are concerned.

"[The respondent] refused to comply with [the department] and refused to comply with most of the referrals [the department] made on his behalf. [The petitioner] has demonstrated, by clear and convincing evidence, that [the respondent] cannot exercise the appropriate judgment necessary to keep Jacqueline safe and healthy and to maximize her abilities to achieve. . . .

"When one also considers the high level of care, patience, and discipline that Jacqueline's needs will require from her caregiver, it is patently clear that [the respondent] is not in a better position to parent his child than he was at the time of Jacqueline's commitment, and he still remains without the qualities necessary to successfully parent her. Effectively, [the respondent] is

no better able to resume the responsibilities of parenting at the time of filing the termination petition than he had been at the time of [Jacqueline's] commitment. . . .

"Even if [the respondent] was finally capable of realizing and addressing his problems, it would be exceedingly rash to expect him to be able to parent [Jacqueline] at any time in the near future, if ever.

"Unfortunately, the clear and convincing evidence shows that Jacqueline's needs for permanence and stability do not allow for the time necessary for [the respondent] to attempt rehabilitation. Given the [respondent's] history associated with his mental health issues, substance abuse issues, parenting deficits, domestic violence, criminal recidivism and a failure to complete and benefit from counseling, it is reasonable to infer that he will remain besieged by those issues for some extensive time and that he will not be physically available to serve as a custodial resource for Jacqueline during the time frame for rehabilitation contemplated in § 17a-112 (j) (3) (B) (ii). . . .

"Given the age, sensibilities, needs, and special needs of [Jacqueline], and given [the respondent's] failure and/ or inability to correct his issues, it would be unreasonable to conclude that he would be able to achieve rehabilitation from his various issues so as to be able to serve as a safe, responsible, and nurturing parent for Jacqueline within a reasonable time.

"Jacqueline needs a parent who is able to effectively care for her now. She cannot wait for the remote possibility that [the respondent] might overcome his mental health issues, substance abuse issues, parenting deficits, domestic violence, criminal recidivism and a failure to complete and benefit from counseling and services and acquire sufficient parenting ability to care for [Jacqueline] one day in the future. Jacqueline is unable to

wait for [the respondent] to show that he has rehabili-
tated himself and is ready to assume his parental role.''
(Citations omitted; internal quotation marks omitted.)

In the dispositional phase of the proceedings, the
court made findings as to each of the criteria set forth
in § 17a-112 (k)[10] and concluded that the termination
of the respondent's parental rights was in Jacqueline's
best interest. Accordingly, the court rendered judgment
terminating the respondent's parental rights and
appointing the petitioner as Jacqueline's statutory par-
ent. This appeal followed.

As a preliminary matter, we first set forth the follow-
ing relevant legal principles. "Proceedings to terminate
parental rights are governed by § 17a-112. . . . Under

---

[10] General Statutes § 17a-112 (k) provides in relevant part that, in determin-
ing whether to terminate parental rights under this section, "the court shall
consider and shall make written findings regarding: (1) The timeliness,
nature and extent of services offered, provided and made available to the
parent and the child by an agency to facilitate the reunion of the child with
the parent; (2) whether the Department of Children and Families has made
reasonable efforts to reunite the family pursuant to the federal Adoption
and Safe Families Act of 1997, as amended from time to time; (3) the terms
of any applicable court order entered into and agreed upon by any individual
or agency and the parent, and the extent to which all parties have fulfilled
their obligations under such order; (4) the feelings and emotional ties of
the child with respect to the child's parents, any guardian of such child's
person and any person who has exercised physical care, custody or control
of the child for at least one year and with whom the child has developed
significant emotional ties; (5) the age of the child; (6) the efforts the parent
has made to adjust such parent's circumstances, conduct, or conditions to
make it in the best interest of the child to return such child home in the
foreseeable future, including, but not limited to, (A) the extent to which
the parent has maintained contact with the child as part of an effort to
reunite the child with the parent, provided the court may give weight to
incidental visitations, communications or contributions, and (B) the mainte-
nance of regular contact or communication with the guardian or other
custodian of the child; and (7) the extent to which a parent has been
prevented from maintaining a meaningful relationship with the child by
the unreasonable act or conduct of the other parent of the child, or the
unreasonable act of any other person or by the economic circumstances of
the parent.''

[that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun. . . .

"If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citation omitted; internal quotation marks omitted.) *In re Autumn O.*, 218 Conn. App. 424, 430–31, 292 A.3d 66, cert. denied, 346 Conn. 1025, 294 A.3d 1026 (2023).

I

The respondent first contends that the court improperly concluded that the department made reasonable efforts to reunify him with Jacqueline pursuant to § 17a-112 (j) (1). The respondent argues that the court's reasonable efforts determination was based on clearly

erroneous factual findings and, consequently, was not supported by sufficient evidence. We disagree.[11]

"Section 17a-112 (j) (1) requires that before terminating parental rights, the court must find by clear and convincing evidence that the department has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate . . . . Thus, the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate. . . . [I]n determining whether the department has made reasonable efforts to reunify a parent and a child . . . the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date on which the termination petition was filed. . . . This court has consistently held that the court, [w]hen making its reasonable efforts determination . . . is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . .

---

[11] As noted herein, pursuant to § 17a-112 (j) (1), "[t]he [petitioner] must prove [by clear and convincing evidence] *either* that [the department] has made reasonable efforts to reunify or, *alternatively*, that the parent is unwilling or unable to benefit from the reunification efforts. Section 17a-112 (j) clearly provides that the [petitioner] is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original; internal quotation marks omitted.) *In re Caiden B.*, 220 Conn. App. 326, 361 n.22, 297 A.3d 1025, cert. denied, 348 Conn. 904, 301 A.3d 527 (2023). Because we conclude that the court properly found that the department's efforts to reunify the respondent with Jacqueline were reasonable, a finding that is sufficient to satisfy § 17a-112 (j), we need not address the merits of the respondent's additional claim that the court erred in finding that he was unable or unwilling to benefit from reunification efforts.

"Our review of the court's reasonable efforts determination is subject to the evidentiary sufficiency standard of review. . . . Under this standard, the inquiry is whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . The court's subordinate findings made in support of its reasonable efforts determination are reviewed for clear error. . . .

"[We do] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . In our review of the record for evidentiary sufficiency, we are mindful that, as a reviewing court, [w]e cannot retry the facts or pass upon the credibility of the witnesses. . . . Rather, [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . .

"Pursuant to § 17a-112, the department has the duty to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [O]ur courts are

instructed to look to the totality of the facts and circumstances presented in each individual case in deciding whether reasonable efforts have been made." (Citations omitted; internal quotation marks omitted.) *In re Caiden B.*, 220 Conn. App. 326, 348–50, 297 A.3d 1025, cert. denied, 348 Conn. 904, 301 A.3d 527 (2023).

"The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [E]very reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *In re Savannah Y.*, 172 Conn. App. 266, 273, 158 A.3d 864, cert. denied, 325 Conn. 925, 160 A.3d 1067 (2017). In considering the respondent's claim in the present case, we note "the reality . . . that incarceration imposes limitations on what the department and its social workers can do and what services it can provide for an incarcerated parent facing termination of his or her parental rights. . . . The reasonableness of the department's efforts must be viewed in the context of these limitations." (Internal quotation marks omitted.) *In re Jadiel B.*, 228 Conn. App. 290, 298, 324 A.3d 211, cert. denied, 350 Conn. 921, 325 A.3d 217 (2024).

In concluding that the department made reasonable efforts to reunify, the court recounted that the department offered several services to the respondent, including administrative case reviews, casework services, supervised visitation, transportation assistance and referrals to substance abuse, domestic violence programs and parenting programs.

The respondent acknowledges that the department "made referrals on his behalf." He nevertheless challenges the court's finding that the department's reunification efforts were reasonable solely on the ground

that "the monthly visits that were supposed to occur did not occur with regularity, which was not reasonable." He argues that, "[w]hen [he] was incarcerated shortly after Jacqueline's birth, visits did not occur until he was released and admitted to Stonington [Institute]." He also argues that the department failed to afford visitation once he was incarcerated in April, 2022. He contends that "[i]n-person visits at the prison were to begin on June 2, 2022, but the case aide forgot to add it to her calendar, so the visit did not occur. The next visit was to be held on June 16, 2022, but that, too, had to be rescheduled. . . . In-person visits actually began in August, 2022."[12] (Citation omitted.)

We disagree with the respondent's allegation that the department failed to afford him regular visitation with Jacqueline. Although the respondent may not have been afforded visitation while he was incarcerated shortly after Jacqueline's birth, the department commenced virtual visits shortly thereafter, when the respondent was admitted to Stonington Institute, and continued those visits while the respondent was on house arrest. The respondent testified that he was "on weekly Skype video calls" with Jacqueline prior to his incarceration in April, 2022. On May 31, 2022, the respondent confirmed with the department that he would like monthly in-person visits with Jacqueline at the correctional facility. The department scheduled the first visit for June 2, 2022, but, as the respondent points out, that visit did not occur due to an error by the case aide, so it was

_____

[12] The respondent also points to visits that he missed in June, July and September, 2023, as evidence that the department's reunification efforts were not reasonable. Because he raises an argument relating to evidence of events that were supposed to occur well beyond the September 7, 2022 date of the filing of the termination petition, they are not properly considered in the adjudicatory phase of the termination proceedings. See *In re Caiden B.*, supra, 220 Conn. App. 348 ("[w]hen making its reasonable efforts determination . . . [the court] is limited to considering only those facts preceding the filing of the termination petition" (internal quotation marks omitted)).

rescheduled for June 16, 2022. As to the respondent's complaint that the June 16, 2022 visit did not occur as scheduled, the record reflects that Jacqueline had a fever on that day and the department tried to reschedule it for June 23, 2022. The record does not reflect whether the visit occurred on June 23, 2022. Even if the respondent's assertion was correct that regular visits did not commence at the correctional facility until August, 2022, the record reflects that, as of June, 2023, the respondent had enjoyed regular monthly visitation with Jacqueline since that time.

Even if we were to conclude that the department should have been more diligent in ensuring that the respondent was afforded regular visitation, we cannot conclude, in light of the entire record, given the services offered to the respondent, as recounted in detail herein, and the visitation that he was afforded, that the missed visits rendered the department's reunification efforts less than reasonable. Our review of the evidence does not leave us with the definite and firm conviction that the court mistakenly found that the department had made reasonable efforts to reunify the respondent and Jacqueline. We therefore reject the respondent's claim that the court's reasonable efforts determination was clearly erroneous and supported by insufficient evidence.

II

The respondent next claims that the court improperly concluded that he failed to achieve a sufficient degree of personal rehabilitation. We disagree.

"Failure of a parent to achieve sufficient personal rehabilitation is one of [the] statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. . . . In regard to the failure to achieve personal rehabilitation, § 17a-112 (j) (3) (B) provides, in relevant part, for the termination of parental rights when the

child (i) has been found . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .

"Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to [his] former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . . . An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities. . . . Although the standard is not full rehabilitation, the parent must show more than any rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation. . . . [E]ven if a parent has made successful strides in [his] ability to manage [his] life and may have achieved a level of stability within [his] limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, [he] could assume a responsible position in the life of [his] children." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Fayth C.*, 220 Conn. App. 315, 318–19, 297 A.3d 601, cert. denied, 347 Conn. 907, 298 A.3d 275 (2023).

"We review the trial court's subordinate factual findings for clear error, and review its finding that the

respondent failed to rehabilitate for evidentiary suffi-
ciency. . . . In reviewing that ultimate finding for evi-
dentiary sufficiency, we inquire whether the trial court
could have reasonably concluded, upon the facts estab-
lished and the reasonable inferences drawn therefrom,
that the cumulative effect of the evidence was sufficient
to justify its [ultimate conclusion]. . . . [I]t is not the
function of this court to sit as the [fact finder] when
we review the sufficiency of the evidence . . . rather,
we must determine, in the light most favorable to sus-
taining the verdict, whether the totality of the evidence,
including reasonable inferences therefrom, supports
the [judgment of the trial court] . . . . In making this
determination, [t]he evidence must be given the most
favorable construction in support of the [judgment] of
which it is reasonably capable. . . . In other words,
[i]f the [trial court] could reasonably have reached its
conclusion, the [judgment] must stand, even if this court
disagrees with it. . . .

"When a child is taken into the [petitioner's] custody,
a trial court must issue specific steps to a parent as
to what should be done to facilitate reunification and
prevent termination of parental rights. . . . Specific
steps provide notice and guidance to a parent as to what
should be done to facilitate reunification and prevent
termination of [parental] rights. . . . Specific steps are
a benchmark by which the court will measure the
respondent's conduct to determine whether termina-
tion is appropriate pursuant to § 17a-112 (j) (3) (B).
. . . [T]he failure to comply with specific steps ordered
by the court typically weighs heavily in a termination
proceeding." (Citations omitted; internal quotation
marks omitted.) *In re Deboras S.*, 220 Conn. App. 1,
30–32, 296 A.3d 842 (2023).

In claiming that the court's findings were clearly erro-
neous, the respondent does not contend, for the most
part, that there was no evidence in the record to support

the court's findings, but, rather, he argues that there was evidence in the record that may have supported a determination that he substantially complied with most of his specific steps.[13] In support of this claim, the respondent argues that the court's findings "do not tell the whole story." In so arguing, the respondent essentially asks this court to reweigh the evidence presented at trial and consider it in a light favorable to him. "This we will not do, as it is not the function of a court of review to retry the facts." (Internal quotation marks omitted.) *In re Olivia W.*, 223 Conn. App. 173, 188 n.12, 308 A.3d 571 (2024).

Moreover, although a different view of the evidence might support the respondent's argument that he attempted to comply with the specific steps to the best of his ability within the constraints imposed by his incarceration, the court acknowledged the respondent's limited progress but nevertheless concluded that the respondent failed to rehabilitate. See *In re Fayth C.*, supra, 220 Conn. App. 319 (although parent's successful strides to manage his life are commendable, they are not dispositive on issue of whether, within reasonable period of time, he could assume responsible position in life of his children). To the extent the respondent seeks to excuse his noncompliance with the court-ordered specific steps, that noncompliance was, at best, an inevitable result of his incarceration or being on house arrest, both circumstances for which the respondent was solely responsible due to his criminal conduct. The record also reflects that, other than his completion of Stonington Institute's substance abuse treatment program in 2021, the respondent failed to complete any treatment programs during the period of time when he was not incarcerated.

___

[13] The respondent also argues that "it is important to note that [the court] appears to have applied an incorrect standard when assessing the petitioner's burden . . . [when it] stated that 'the critical issue for this court is whether the [respondent] had achieved the rehabilitation sufficient to render him

We also reject the respondent's challenge to the court's finding that he is in no better position now to assume a responsible position in Jacqueline's life than when she was committed. He argues that when Jacqueline was committed, he had several criminal charges pending and he was using drugs. Of course, at the time of the termination trial, the respondent no longer had several charges pending because by then he had been convicted of and sentenced for those charges, although he still had more than one year remaining to serve on his sentence. Also, it is reasonable to infer that, by virtue of his incarceration, he was no longer abusing drugs at the time of trial. Although this may be construed as progress in terms of the respondent making personal strides, that purported progress is not the result of the respondent's compliance with the department's referrals for services.[14] For instance, the respondent emphasizes that he has "stay[ed] clean" since his last positive drug test upon his admission to Stonington Institute in November, 2021.[15] "[S]taying clean" is not the equivalent to completing treatment programs. The respondent testified that he had been abusing drugs since he was in high school. The fact that the respondent

able to care for his child.' " It is clear from a reading of the entirety of court's decision that it knew and applied the correct legal standard.

[14] The respondent also emphasizes the programs he completed while incarcerated in 2023 as evidence of his rehabilitation. His reliance on these programs is misplaced in that he completed them well after the September 7, 2022 adjudicatory date.

[15] The respondent contends that his November, 2021 positive drug test should not have been used against him because the final specific steps were not issued until January 5, 2022. The respondent ignores the fact that specific steps were first issued on September 3, 2021, and included that he refrain from the use of illegal drugs. Additionally, although there was no evidence of any additional positive drug tests, the record likewise does not reflect that he was tested during the times that he was not incarcerated or at Stonington Institute. Additionally, when the respondent was readmitted to Stonington Institute in February, 2022, he was diagnosed with cannabis and crack cocaine dependence, whereas he was diagnosed with only cocaine dependence when he was admitted in November, 2021.

allegedly "stay[ed] clean" during the limited time during Jacqueline's life when he was not incarcerated does not, in itself, demonstrate that he will be able to do so when he is released from prison.

On the basis of our thorough review of the record, we are not left with the definite and firm conviction that a mistake has been made in this case. We therefore conclude that the court's findings were not clearly erroneous and the respondent's challenge to the evidentiary sufficiency of the court's determination that he failed to achieve the requisite degree of personal rehabilitation required by § 17a-112 (j) (3) (B) is unavailing.

### III

Finally, the respondent claims that the court erroneously found that termination of his parental rights was in Jacqueline's best interest. We disagree.

In assessing Jacqueline's best interest, the court considered and made written findings as to each of the factors enumerated in § 17a-112 (k). The court reiterated its findings that the department offered timely, appropriate and comprehensive services to the respondent to facilitate his reunification with Jacqueline, but that he was unable and/or unwilling to benefit from those services. The court found, inter alia, that the respondent was aware of his issues and deficits and had received specific steps addressing those issues, but he failed to comply with several of those steps. The court further found that the respondent had been unable and/or unwilling to make realistic and sustained efforts to conform his conduct to acceptable parental standards or to serve as a safe, nurturing and responsible parent for Jacqueline. The respondent complied with certain services offered by the department, but his ability to care for Jaqueline remained poor in that he had failed to gain insight into the efforts needed in order to become a safe, nurturing and responsible parent. The

court found that Jacqueline had a bond with her foster mother and a visiting bond with the respondent. The court explained that "[t]o ask Jacqueline to wait for [the respondent] to be released from jail, establish himself in the community, successfully complete his rehabilitative programs and show himself to be a safe, responsible and nurturing parent is asking this child to wait too long for something which may never come to pass, based upon [the respondent's] history." The court concluded: "Having balanced the individual and intrinsic needs of . . . Jacqueline for stability and permanency against the benefits of maintaining a connection with the respondent . . . the clear and convincing evidence in this case establishes that [Jacqueline's] best interest cannot be served by continuing to maintain any legal relationship to the respondent . . . ." Accordingly, the court concluded that the termination of the respondent's parental rights was in Jaqueline's best interest.

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as

guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence. . . .

"[A]n appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . . [T]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . Although a judge [charged with determining whether termination of parental rights is in a child's best interest] is guided by legal principles, the ultimate decision [whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re Javonte B.*, 226 Conn. App. 651, 659–61, 318 A.3d 1095 (2024).

"In addition to considering the seven factors listed in § 17a-112 (k), [t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . Furthermore, in the dispositional

stage, it is appropriate to consider the importance of permanency in children's lives." (Internal quotation marks omitted.) *In re Ava M.*, 223 Conn. App. 590, 604, 309 A.3d 383, cert. denied, 348 Conn. 962, 312 A.3d 38 (2024).

In support of his challenge to the court's best interest determination, the respondent argues that "many of the § 17a-112 (k) factors should have been found in his favor had the court made findings in accordance with the evidence. The factual findings in this case were sloppy and were biased in favor of the petitioner, with no consideration for the facts that weighed in favor of the respondent." In support of this argument, the respondent reiterates his claims that the court erred in determining that the department made reasonable efforts to reunify him with Jacqueline and that he failed to rehabilitate. We have addressed and rejected those claims and need not address them further here.

Notably, the respondent does not challenge the court's findings that Jacqueline needs stability, continuity, and permanency in her life and that the respondent is unable to provide those things. On the basis of our review of the record, we are not left with a definite and firm conviction that a mistake has been made in this case. We therefore reject the respondent's claim that the court's best interest determination was clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.